# In the United States Court of Federal Claims

No. 12-37C
(Filed Under Seal: February 28, 2012)
(Reissued for Publication: March 13, 2012)[*]

```
*************************************
SOLUTE CONSULTING,                    *
                                      *
          Plaintiff,                  *
                                      *
v.                                    *   Motion to Dismiss, RCFC 12(b)(1); Task
                                      *   Order Protest Bar, 10 U.S.C. § 2304c(e);
THE UNITED STATES,                    *   Increasing the Scope of the Contract;
                                      *   Allegations Related to the Agency's
          Defendant,                  *   Evaluation of Proposals; "Scope" Refers to
                                      *   "Scope of Work"
and                                   *
                                      *
SENTEK CONSULTING, INC.,              *
                                      *
          Defendant-Intervenor.       *
*************************************
```

Ronald S. Perlman, Washington, DC, and William M. Pannier, Los Angeles, CA, for plaintiff.

Elizabeth A. Speck, United States Department of Justice, Washington, DC, for defendant.

Richard B. Oliver, Los Angeles, CA, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

        The protestor in this postaward bid protest challenges the issuance of a task order to another offeror, contending that the agency that issued the task order improperly increased the scope of the underlying contract by waiving certain contractual requirements and by failing to evaluate the task order proposals in accordance with the requirements and criteria set forth in the task order solicitation. It further contends that the agency's evaluation of the task order proposals was unreasonable and disparate. The court generally possesses jurisdiction to entertain a claim

---

        [*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties and, as discussed in a concurrently filed order, most of the redactions proposed by defendant. Redactions are indicated with a bracketed ellipsis ("[. . .]").

that a task order exceeds the scope of the underlying contract. Here, however, the protestor's allegations do not concern the scope of the underlying contract, but instead relate solely to the agency's evaluation of the task order proposals. Accordingly, the court dismisses the protest for lack of jurisdiction.

## I. BACKGROUND

The United States Navy ("Navy") uses the SeaPort-e program, a multiple award contract vehicle, to acquire support services in twenty-two functional areas.[1]  Am. Compl. ¶ 16; AR 999-1003. Under the program, the Navy has awarded over 1,800 indefinite-delivery, indefinite-quantity contracts, Am. Compl. ¶ 16, including one to Solute Consulting ("Solute") and another to Sentek Consulting, Inc. ("Sentek"),[2] AR 936, 992. Each contract contained a description of the work to be acquired in a "Scope of Contract" section:

> This [Statement of Work] defines the overarching requirements for providing engineering, technical, and programmatic support services. The Contractor shall, in response to task orders issued under this contract by the Naval Sea Systems Command, Naval Air Systems Command, Space and Naval Warfare Systems Command, Naval Supply Systems Command, Military Sealift Command, Naval Facilities Command, Strategic Systems Programs, and the United States Marine Corps, provide services that potentially span the entire spectrum of mission areas supported by the activities and technical capabilities that comprise the various ordering offices.

Id. at 999. The contracts also included a clause describing the process for issuing task orders to acquire the particular support services required by the Navy.  Id. at 1016-22.

On June 3, 2011, the Navy's Space and Naval Warfare Systems Command ("SPAWAR") issued task order solicitation N00024-11-R-3332 to acquire support services for the Carrier and Air Integration Program Office ("PMW 750").  Id. at 35-36, 141-43. The solicitation was set aside for small businesses and would result in a cost-plus-fixed-fee task order with an initial term of one year and four additional option years.  Id. at 84, 100-01, 113, 134. In accordance with the clause concerning the task order process in the underlying SeaPort-e contracts, SPAWAR

---

[1]  The court derives the facts in this section from the amended complaint ("Am. Compl.") and the administrative record ("AR"). The court did not consider the declaration attached to the protestor's complaint, which defendant moves to strike, or the declaration that defendant seeks to add to the administrative record.

[2]  The boilerplate language in Solute's and Sentek's contracts is the same.  Compare AR 936-91 (Sentek's contract), with AR 992-1047 (Solute's contract). For simplicity, the court only cites Solute's contract when referring to the SeaPort-e contract underlying the task order solicitation at issue.

intended to issue the task order to the responsible offeror whose proposal was most advantageous to the government under the evaluation criteria set forth in the solicitation. Id. at 118-19, 132, 181-85, 1018, 1021.

The specific support services to be acquired by SPAWAR were described in a Performance Work Statement ("PWS") included with the task order solicitation. Id. at 94, 138-78. As set forth in the PWS's "Scope" section, the successful offeror was to perform tasks in the following seven functional areas: program management, financial planning, contracting support, administrative support, production and installation management, acquisition support, and technical support services. Id. at 143. Further, each of the tasks was associated with a particular phase of the performance requirement–the operation and maintenance phase, the production phase, the development phase, or the shipbuilding and conversion phase. Id. at 139, 146-73.

Pursuant to the solicitation, offerors were to submit a cost proposal, a technical proposal, and other documents relating to the provision of 102,720 direct labor hours per year. Id. at 86, 119-29. They were further instructed to include the following information in their technical proposals:

1.  FACTOR 1 - ORGANIZATIONAL EXPERIENCE - The offeror shall describe the depth and breadth of its experience in performing the tasks described in Section 5 of the PWS using specific examples from other contracts and/or efforts. Specifically address each of the following areas: Program Management, Financial Planning, Contracting Support, Administrative Support, Production and Installation Management, Acquisition Support, and Technical Support. Seven (7) page maximum . . . .

2.  FACTOR 2 - MANAGEMENT CAPABILITY - The offeror shall describe its approach for managing the workload associated with this effort as well as any subcontractors which may be utilized to perform the work under this task. The offeror's management approach shall address each of the following areas: subcontractor management (if applicable), process for ensuring product quality, plan for controlling costs, process to ensure timeliness of deliverables and support products, and method for staffing the task to ensure the most effective and economical performance. Three (3) page maximum . . . .

3.  FACTOR 3 - KEY PERSONNEL - The offeror shall submit eight (8) resumes for Key Personnel. One resume per Functional Area is required. If the proposed individual is not a current employee, the offeror shall provide Letters of Intent signed by the proposed individual indicating availability to perform work under this Task Order upon award. The offeror shall provide resumes only for the Key Personnel. Key Personnel relevant education and experience will be evaluated to assess the Offeror's ability to perform the requirements identified in Section 5.0 of the PWS. Key Personnel relevant qualifications and experience will be evaluated

to assess the Offeror's ability to perform the requirements identified in Section 5.0 of the PWS.  . . .

. . . .

4.  FACTOR 4 - PAST PERFORMANCE - The offeror shall submit up to three (3) Relevant Experience Forms of contracts/task orders issued in the past three (3) years.  . . .  'Relevant' past performance is defined as: work of a similar nature, scope, and complexity as required by . . .  Section 5.0 of the Performance Work Statement . . . .  If available, the offeror shall attach the most recent Contractor Performance Assessment Reporting System . . .  evaluation . . . for each experience.  . . .  The Government reserves the right to use past performance information obtained from sources other than those identified by the offeror in the evaluation of past performance.  If no recent/relevant performance record is available, or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned, the result will be a neutral performance assessment, which will neither be used to the advantage or disadvantage of the offeror.

Id. at 126-29.

Upon the receipt of proposals, SPAWAR planned, as set forth in the solicitation, to evaluate them on the following four technical factors, in descending order of importance:

(a) Factor 1: Organizational Experience

The offeror will be evaluated on the extent to which the offeror's proposal demonstrates its depth and breadth of experience in performing support in each of the following areas: Program Management, Financial Planning, Contracting Support, Administrative Support, Production and Installation Management, Acquisition Support, and Technical Support.

(b) Factor 2: Management Capability

The offeror will be evaluated on the extent to which the offeror's proposal addresses its management approach in each of the following areas: subcontractor management (if applicable), process for ensuring product quality, plan for controlling costs, process to ensure timeliness of deliverables and support products, and method for staffing the task to ensure the most effective and economical performance.

(c) Factor 3: Key Personnel

The offeror will be evaluated on the extent to which the Key Personnel resumes meet the required and desired qualifications identified in Section L.

(d) Factor 4: Past Performance

The Government will evaluate the Offeror's submitted records of past performance.  The evaluation will be a subjective, but unbiased, judgment about the quality of the Offeror's past performance. The Government will use its subjective evaluation to determine an Offeror's relative capability and trustworthiness, and thus the relative reliability of the Offeror's promises as they relate to potential risks to the Government.  The Government may also evaluate information from other sources, task orders and contracts other than those identified by the Offeror in the evaluation of past performance.

Id. at 132-33; see also id. at 1018 (noting, in the underlying SeaPort-e contract, that evaluation of past performance would be based on the offerors' past performance data for work performed under the contract, "as well as other information available to the Government").  SPAWAR also intended to evaluate the offerors' proposed costs/prices for the base year and each of the option years, arriving at a total evaluated cost/price for each offeror.  Id. at 133-34.  When combined, the technical factors were significantly more important than the offerors' total evaluated costs/prices.  Id. at 132.

According to the Source Selection Plan, in evaluating the proposals, SPAWAR would determine whether they contained major strengths, strengths, weaknesses, major weaknesses, or deficiencies.  Id. at 183-84.  Then, based on these assessments, SPAWAR would assign ratings for each factor.  Id.  For the organizational experience and management capability factors, a proposal could be rated outstanding, good, acceptable, marginal, or unacceptable.  Id. at 183.  For the key personnel factor, a resume could be considered outstanding, good, acceptable, marginal, or unacceptable.  Id.  For the past performance factor, the relevancy of performance could be deemed very relevant, relevant, somewhat relevant, or not relevant.  Id. at 184.  SPAWAR would also assign a past performance confidence assessment of substantial confidence, satisfactory confidence, limited confidence, no confidence, or unknown confidence.  Id.  Finally, SPAWAR would assess an overall risk rating for each proposal of low, moderate, or high.  Id. at 183.

Five contractors, including Solute (the incumbent contractor) and Sentek submitted proposals in response to the task order solicitation.  Id. at 197.  The Technical Evaluation Board ("TEB") evaluated the proposals, determined the proposals' strengths and weaknesses, and assigned the following ratings:

| Factor | Solute | Sentek |
|---|---|---|
| **Overall** | Marginal | Outstanding |
| **Organizational Experience** | Acceptable | Outstanding |
| **Management Capability** | Marginal | Acceptable |
| **Key Personnel** | Outstanding | Good |
| **Past Performance - Confidence** | Limited Confidence | Substantial Confidence |
| **Risk** | Moderate | Low |

Id. The TEB concluded that Sentek had the highest rated proposal and Solute had the second highest rated proposal, and recommended issuing the task order to Sentek. Id. A Cost Team separately evaluated the costs/prices proposed by each offeror. Id. at 416-508. It concluded that Solute's total evaluated cost/price was [. . .] and that Sentek's total evaluated cost/price was [. . .]. Id. at 418. The Source Selection Authority, after reviewing the TEB's report and the cost/price analysis report, concurred with the TEB and determined that Sentek's proposal would provide the best value to the government. Id. at 250, 254-55. The task order was therefore issued to Sentek. Id. at 1048.

Solute requested and received a debriefing from SPAWAR and then, on October 11, 2011, filed a protest with the United States Government Accountability Office ("GAO"). Id. at 2. It withdrew that protest, however, on January 12, 2012, indicating its intent to pursue its claims in the United States Court of Federal Claims ("Court of Federal Claims"). Id. at 935.

Solute filed its protest in this court on January 18, 2012, and then filed an amended complaint on January 23, 2012. It presents two claims for relief in its amended complaint. First, it contends that SPAWAR improperly increased the scope of the underlying contract by waiving certain contractual requirements and by failing to evaluate the task order proposals in accordance with the requirements and criteria set forth in the task order solicitation. Am. Compl. ¶¶ 140-43. Second, it contends that SPAWAR's evaluation of the proposals was unreasonable and that SPAWAR did not treat the proposals equally during its evaluation. Id. ¶¶ 144-48. In support of these claims for relief, Solute challenges almost all of the ratings assigned to its proposal,[3] as well as some of the strengths and weaknesses assigned (or not assigned) by the TEB to its proposal and Sentek's proposal. Id. ¶¶ 29-118. In particular, Solute identifies approximately

---

[3] The only rating not challenged by Solute is the outstanding rating it received for the key personnel factor. Am. Compl. ¶ 30.

fourteen purported errors with the TEB's evaluation of the organizational experience factor, approximately eleven purported errors with the TEB's evaluation of the management capability factor, approximately three purported errors with the TEB's evaluation of the key personnel factor, and approximately nine purported errors with the TEB's evaluation of the past performance factor.  Id.  For clarity, the court summarizes the purported errors in the following list:

Organizational Experience Factor

• The assignment of a major strength to Sentek for [. . .] and the comment that the [. . .] would "'directly influence approximately [. . .] of the PWS and provide appreciably exceptional performance for the tasking described'" in several paragraphs of the PWS.  Id. ¶¶ 37-45.

• The assignment of a strength to Sentek for financial planning and the comment that [. . .] in two paragraphs of the PWS.  Id. ¶ 46.

• The assignment of a strength to Sentek for contracting support and the acceptance of Sentek's comment that it [. . .].  Id. ¶ 47.

• The failure to assign Sentek a significant weakness or deficiency for a [. . .] of the PWS performance requirements.  Id. ¶ 48.

• The failure to assign Solute a major strength or strength for its experience in supporting the procurement and development of command, control, communications, and computers and integration products.  Id. ¶ 52.

• The failure to assign Solute a strength for its experience in providing financial planning, cost modeling and estimating, POM, and budgeting support.  Id. ¶ 53.

• The failure to assign Solute a major strength or strength for its extensive experience in providing preaward and postaward contract support.  Id. ¶ 54.

• The failure to assign Solute a strength for its experience in providing all of the required administrative support.  Id. ¶ 55.

• The failure to assign Solute a strength for its extensive, highly-rated experience in providing production and installation management support.  Id. ¶ 56.

• The failure to assign Solute a strength for its fifteen years of experience in providing acquisition support.  Id. ¶ 57.

- The failure to assign Solute a strength for its experience in providing required technical support.  Id. ¶ 58.

- The failure to assign Solute a major strength or strength for its existing fleet relationships.  Id. ¶¶ 59-61.

- The assignment of a weakness to Solute for a [. . .].  Id. ¶¶ 62-64.

- The rating of Solute's proposal as acceptable while at the same time rating Sentek's proposal as outstanding.  Id. ¶ 65.

Management Capability

- The assignment of a weakness to Solute for its product quality process and the comment that Solute did not "'have a solid plan to control costs.'"  Id. ¶¶ 68-69.

- The failure to assign Sentek a weakness for its product quality process.  Id. ¶ 70.

- The failure to assign Solute a major strength or strength for having the required Defense Contract Audit Agency ("DCAA")-approved accounting systems.[4]  Id. ¶¶ 71-72.

---

[4]  The underlying SeaPort-e contract provides: "The Contractor shall provide and maintain an accounting system, acceptable to the Administrative Contracting Officer and the [DCAA], which collects costs incurred and effort (compensated and uncompensated, if any) provided in fulfillment of the level of effort obligations of this contract."  AR 1011-12. Similarly, the task order solicitation provides:

> In order to be awarded a cost reimbursement contract, a contractor must have an adequate accounting system.  Cover letters shall include the report number and date of the cognizant DCAA office's determination stating that the prime contractor's and subcontractor's accounting system is adequate for the accumulation, reporting, and billing of costs under a cost reimbursement contract (attach a copy of the report).

Id. at 89, 117, 120; see also id. at 125 ("In order to be awarded a cost reimbursement contract, a contractor must have an adequate accounting system.  Offerors shall provide a copy of the report from the cognizant DCAA office stating that the Offeror's accounting system is adequate for the accumulation, reporting, and billing of costs under a cost reimbursement contract.").

- The failure to assign Sentek a weakness, significant weakness, or deficiency for not demonstrating that two of its subcontractors had DCAA-approved accounting systems.  Id. ¶¶ 73-74.

- The assignment of a weakness to Solute for failing to "'adequately describe [its] process for ensu[r]ing timeliness of deliverables and support products'" and the comment that Solute did not describe how the tracking tools mentioned in the proposal would be used.  Id. ¶¶ 75-76.

- The failure to assign Solute a strength for its proposal to use the same experienced personnel that are currently managing and performing the work. Id. ¶¶ 77, 79.

- The failure to assign Sentek a weakness or significant weakness for its staffing plan when the plan is based on the assumption that Sentek can lure away over twelve of Solute's current employees.  Id. ¶ 78.

- The failure to assign Solute a strength for its compliance with the requirement that the prime contractor must perform at least fifty percent of the work as determined by cost.[5]  Id. ¶ 80.

- The failure to assign Sentek a weakness, significant weakness, or deficiency for its noncompliance with the requirement that the prime contractor must perform at least fifty percent of the work as determined by cost.  Id. ¶ 81.

- The failure to assign Sentek a weakness related to its process for ensuring the timeliness of its deliverables.  Id. ¶ 82.

- The rating of Solute's proposal as marginal rather than outstanding and the rating of Sentek's proposal as acceptable.  Id. ¶¶ 83-84.

---

[5]  Both the underlying SeaPort-e contract and the task order solicitation expressly incorporate Federal Acquisition Regulation ("FAR") 52.219-14, Limitations of Subcontracting (Dec. 1996), AR 113, 1034, which provides: "By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for" services, "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern."  The underlying SeaPort-e contract further provides: "To be eligible as a Small Business, . . . the Offeror must have had that status at the time of proposal submission that resulted in the award of the SeaPort Enhanced IDIQ contract award, or for orders solicited under this contract after the close of the base period must properly hold that status at the beginning of each award term period and must propose to perform at least 51% of the work under the solicited task order (See FAR 52.219-14)."  Id. at 1017.

Key Personnel

- The failure to deem Sentek ineligible to receive the task order as a result of Sentek proposing key personnel who were not qualified or were unavailable to perform the work.[6] Id. ¶¶ 85-88.

- The rating of Solute's proposal as outstanding in key personnel, but only acceptable, and not outstanding, for organizational experience. Id. ¶¶ 90-91.

- The rating of Solute's proposal as outstanding in key personnel but only finding limited, not substantial, confidence in Solute's past performance. Id. ¶ 92.

Past Performance

- The finding of satisfactory, rather than substantial, confidence with respect to Solute's first past performance reference. Id. ¶¶ 99-101.

- The finding of limited confidence with respect to Solute's second past performance reference. Id. ¶¶ 102-05.

- The finding of relevant, rather than very relevant, as well as the finding of satisfactory confidence, with respect to Solute's third past performance reference. Id. ¶¶ 106-08.

- The selection and evaluation of a fourth past performance reference for Solute that was not included in Solute's proposal. Id. ¶¶ 109-11.

- The finding of relevant, rather than not relevant, with respect to Sentek's first past performance reference. Id. ¶¶ 114-15.

- The finding of high confidence with respect to Sentek's second past performance reference. Id. ¶ 116.

- The failure to select and evaluate additional past performance references for Sentek. Id. ¶ 117.

- The finding of substantial, rather than limited, confidence in Sentek's past performance. Id. ¶¶ 93, 96-98, 113-18.

---

[6] Pursuant to the task order solicitation, offerors agreed to assign eight specifically identified key personnel to the task order and further agreed that their ability to substitute other individuals was limited, especially within the first 180 days of task order performance. AR 96.

- The failure to find substantial, rather than limited, confidence in Solute's past performance.  Id. ¶¶ 94, 96-113, 118.

Solute considers each of the above purported errors to be problematic because the TEB either treated the proposals differently during its evaluation, based its determination on information unrelated to the evaluation criteria, or considered information that was not included in the proposals.  Id. ¶¶ 29-118.  According to Solute, these problems resulted in Solute's proposal receiving lower ratings than it should have received and Sentek's proposal receiving higher ratings than it should have received.  Id.

Solute also challenges, based on the purported errors set out above, SPAWAR's best value determination.  Id. ¶¶ 119-39.  It contends that if SPAWAR had properly evaluated the proposals, its technical ratings would have been better than Sentek's technical ratings and, given its lower evaluated cost/price, its proposal would have been declared the best value for the government.  Id. ¶¶ 119-24.  Ultimately, plaintiff seeks a declaration that the task order issued to Sentek is void, a declaration that SPAWAR must either issue the task order to Solute or reevaluate the proposals, and an injunction preventing SPAWAR from authorizing work to proceed under the task order, at least until SPAWAR reevalutes the proposals and renders a new best value determination.  Id. at 38-39.

Solute filed an application for a temporary restraining order and motion for a preliminary injunction along with its initial complaint, and also moves to supplement the administrative record with the declaration it attached to its complaint.  The government moves to dismiss Solute's protest for lack of jurisdiction, strike the declaration that was attached to the complaint, and supplement the administrative record with a declaration addressing the effects of an award of injunctive relief.  The court heard argument on these motions on February 27, 2012.

## II. DISCUSSION

Defendant moves to dismiss Solute's complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction.[7] Land

---

[7] As noted above, Solute attached a declaration to its complaint and defendant moves to supplement the administrative record with another declaration.  The court did not rely upon these declarations in its jurisdictional analysis because they address the merits of Solute's protest–e.g., alleged evaluation errors by SPAWAR, statements made to Solute at the postaward debriefing,

v. Dollar, 330 U.S. 731, 735 & n.4 (1974).  If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

The Court of Federal Claims possesses jurisdiction over postaward bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2006).  Specifically, the Tucker Act provides that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  Id. § 1491(b)(1).  Further, the Tucker Act permits the Court of Federal Claims to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."  Id. § 1491(b)(2).

However, in enacting the Federal Acquisition Streamlining Act of 1994 ("FASA"), Congress limited the court's jurisdiction to entertain bid protests when the protest concerns the issuance of a task order.[8]  See 10 U.S.C. § 2304c(e) (2006 & Supp. IV).  In such circumstances, the court is not authorized to entertain the protest unless it is based "on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued[.]"[9]  Id. § 2304c(e)(1)(A).  See generally A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 133-35 (2006) (discussing the task order protest bar).

Here, Solute asserts that its protest is permissible because the task order issued to Sentek exceeds the scope of the underlying SeaPort-e contract.  Specifically, it alleges that SPAWAR issued the task order to Sentek even though Sentek's proposal did not comply with the contractual requirements relating to DCAA-approved accounting systems, subcontracting plans,

_____

and alleged harm that the government would suffer if a temporary restraining order or preliminary injunction is entered by the court–and not the court's jurisdiction to entertain it.

[8]  These limitations applied to protests relating to task orders issued by both military and civilian agencies.  Pub. L. No. 103-355, §§ 1004, 1054, 108 Stat. 3243, 3253, 3264.  However, Congress later permitted the limitations pertaining to protests of task orders issued by civilian agencies to expire.  See 41 U.S.C. § 4106(f)(3) (2006 & Supp. IV) ("This subsection shall be in effect for three years, beginning on the date that is 120 days after January 28, 2008."); FAR 16.505(a)(10)(ii) (2012) (noting that the protest bar relating to task orders issued by agencies other than the United States Department of Defense, the National Aeronautics and Space Administration, and the United States Coast Guard expired on May 27, 2011).  See generally MORI Assocs., Inc. v. United States, No. 10-298C, 2011 WL 6409124, at *27-34 (Fed. Cl. Dec. 15, 2011) (discussing the expiration of the task order protest bar relating to civilian agency task orders).

[9]  The other exception to the task order protest bar is protests of task orders valued at more than $10,000,000.  10 U.S.C. § 2304c(e)(1)(B).  However, the GAO has exclusive jurisdiction over such protests.  Id. § 2304c(e)(2).

and key personnel, thereby waiving those requirements.  Therefore, it argues, because the task order contained terms that are not authorized in the underlying contract, the task order is beyond the scope of the contract.  Solute further alleges that SPAWAR failed to evaluate the task order proposals in accordance with the requirements and criteria set forth in the task order solicitation despite being required to do so by the terms of the underlying contract.  Therefore, it contends, because the task order was issued in contravention of the terms of the underlying contract, it exceeds the scope of the contract.  The thrust of Solute's allegations is that an agency's flawed evaluation process in connection with the issuance of a task order can result in a task order that exceeds the scope of the underlying contract.  Solute's attempt to expand the definition of "scope" in this way is not persuasive.

First and foremost, plaintiff's expansive definition of "scope" would render the task order protest bar meaningless.  Solute suggests that any departure from the task order solicitation or underlying contract results in a task order that exceeds the scope of the contract.  If this were true, then all protests related to task orders would fit within the "increases the scope" exception set forth in 10 U.S.C. § 2304c(e)(1)(A).  Such a construction would clearly frustrate the congressional intent to limit contractors' ability to protest the issuance of task orders.  See also A & D Fire Prot., Inc., 72 Fed. Cl. at 134 ("This court cannot frustrate the intent of Congress, which was to exempt from protest the issuance of individual task orders to contractors who had already received awards, subject to protest, of their master IDIQ contracts.").  And, it is well settled that a statute should not be construed in such a way as to render it meaningless or inoperative.  See Corley v. United States, 556 U.S. 303, 314 (2009); Roche v. Merit Sys. Prot. Bd., 596 F.3d 1375, 1380 (Fed. Cir. 2010).

Further, Solute's expansive definition of "scope" does not comport with the language of its contract with the Navy or the task order solicitation at issue.  Solute's contract with the Navy uses "scope" in reference to the work the Navy intended to acquire from Solute.  AR 999.  And, in the task order solicitation's PWS, "scope" is used in reference to the tasks SPAWAR intended to acquire in seven functional areas.  Id. at 143; see also 10 U.S.C. § 2304a(b)(3) (requiring a task order solicitation to include a "statement of work, specifications, or other description that reasonably describes the general scope, nature, complexity, and purposes of the services or property to be procured under the contract" (emphasis added)).  In neither document is the term "scope" used in the broader sense Solute advocates.

Moreover, there is no support for Solute's expansive definition of "scope" in the statutory text, legislative history, or case law.  Beginning with the statutory text, Congress did not define the term "scope" in the FASA or any subsequent amendments to the FASA.  Nor does the legislative history of the FASA provide any guidance.  Cf. Labat-Anderson, Inc. v. United States, 50 Fed. Cl. 99, 105 (2001) ("In establishing jurisdiction, the Court does not rely on the FASA's legislative history because it does not shed meaningful light on the scope of the task order protest bar.").

The case law, however, does supply direction.  The Court of Federal Claims, in entertaining protests related to the issuance of task orders, has consistently understood "scope" to refer to the scope of work authorized in the contract.  For example, in Phoenix Air Group, Inc. v. United States, the court analyzed whether a task order exceeded the scope of the underlying contract by comparing the flight services described in the task order with the flight services described in the contract, paying particular attention to the contract's "Scope of Contract" section.  46 Fed. Cl. 90, 105-06 (2000).  Similarly, in Omega World Travel, Inc. v. United States, the court held that the protestor could challenge the task orders at issue on the ground that they exceeded the scope of the underlying contract "to include services not contemplated by the" contract.  82 Fed. Cl. 452, 464 (2008).  And, most strikingly, the court in A & D Fire Protection, Inc. noted that the irregularities in the task order proposal evaluation process demonstrated by the protestor did not fit with the "increases the scope" exception of the task order protest bar, and therefore held that it lacked jurisdiction over the protest.  72 Fed. Cl. at 133 n.7, 140-41.  The parties have not cited any task order protest decisions from the Court of Federal Claims in which "scope" was treated as anything other than the scope of work, nor could the court, after an extensive search, locate any.

Defining "scope" as the scope of work finds further support in decisions addressing a similar issue: whether a contract modification improperly exceeds the scope of a contract.  In AT&T Communications, Inc. v. Wiltel, Inc., the United States Court of Appeals for the Federal Circuit ("Federal Circuit") held that a "modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause" and explained that to determine whether the modification was improper, a court should examine "whether the contract as modified materially departs from the scope of the original procurement."  1 F.3d 1201, 1205 (Fed. Cir. 1993).  Then, applying these standards, the Federal Circuit analyzed whether certain telecommunications technology described in a contract modification was encompassed "within the work obligations" described in the underlying contract.  Id. at 1206.  In other words, it compared the work procured through the contract modification to the work procured through the contract.  The Court of Federal Claims has applied the standard set forth in AT&T Communications, Inc. in the same manner: analyzing a challenge to the scope of a contract modification by comparing the products or services described in the contract with the products or services described in the contract as modified.  See, e.g., Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 350, 427-44 (2009) (concluding that a modification to a task order added systems and services to the task order that increased the scope of the task order); Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443, 467-68 (2001) (holding that the modifications challenged by the protestor as outside the scope of the contract did not "represent the addition of new products or services to those originally competed under the solicitation"); Phoenix Air Grp., Inc., 46 Fed. Cl. at 105-06 (analyzing whether the contract's "Scope of Contract" section described the flight services described in a contract modification).  The GAO decisions cited by plaintiff offer the same analysis.  See Poly-Pac. Techs., Inc., B-296029, 2005 CPD ¶ 105 (Comp. Gen. June 1, 2005) ("An agency may not modify a contract by changing or relaxing requirements where the resulting work is fundamentally different from the work anticipated by the original solicitation."); Avtron Mfg., Inc., 67 Comp. Gen. 404 (1988)

(agreeing that the "proposed modification to the purchase description materially alters the terms of the original contract in that it significantly affects the design, construction, and performance of the aircraft generator test stand, thereby changing the scope of the contract so as to amount to a renegotiation of a new contract").

In fact, because the issues are so similar, the GAO has concluded that "[t]he analysis of whether a task order is outside the scope of a multiple-award contract is the same as the analysis of whether a contract modification is outside the scope of a single-award contract." DynCorp Int'l LLC, B-402349, 2010 CPD ¶ 59 (Comp. Gen. Mar. 15, 2010). It has therefore held that a task order exceeds the scope of the underlying contract when "there is a material difference between the task order and that contract" such that potential offerors would not "reasonably have anticipated" that a task order of that nature could be issued. Id. The GAO looks for a material difference by

> reviewing the circumstances attending the procurement that was conducted; examining any changes in the type of work, performance period, and costs between the contract as awarded and as modified by the task order; and considering whether the original contract solicitation adequately advised offerors of the potential for the type of task order issued.

Id.

The GAO has consistently applied the material difference standard by comparing the work involved in the task order with the work involved in the underlying contract. In DynCorp Int'l LLC, for example, it examined whether proposed task orders to provide mentoring, training, facility maintenance, and logistics support in Afghanistan described services outside the scope of a contract for program and operations support for the Department of Defense Counter Narcoterrorism Technology Program Office. Id. In California Industrial Facilities Resources, Inc., the GAO analyzed whether the tents and related equipment that were the subject of a task order were the types of goods that could be acquired under a contract to provide special operational logistical equipment. B-403421 et al., 2010 CPD ¶ 269 (Comp. Gen. Nov. 5, 2010). And, in a protest concerning the issuance of a task order under a SeaPort-e contract, the GAO determined that the task order did not exceed the scope of the underlying contract because the training acquired with the task order fit within the contract's definition of technical training. Fla. State Coll. at Jacksonville, B-402656, 2010 CPD ¶ 146 (Comp. Gen. June 4, 2010). Once again, the parties have not cited, and the court could not find, any GAO decisions in which a task order protest challenging flaws in the evaluation process was permitted to proceed under the "increases the scope" exception in 10 U.S.C. § 2304c(e)(1)(A).

In sum, the Federal Circuit, the Court of Federal Claims, and the GAO all analyze whether a contract modification or task order increases the scope of the underlying contract by comparing the scope of work described in the modification or task order with the scope of work described in the underlying contract. There is no reason to treat this case differently.

Accordingly, in the absence of any legal support for Solute's expansive definition, the court finds that the term "scope," as used in 10 U.S.C. § 2304c(e)(1)(A), refers to the scope of work contemplated in the contract and not to purported flaws in the evaluation process.

Solute has not alleged that the work described in the task order solicitation's PWS is beyond the scope of the work described in the underlying SeaPort-e contract.  Nor has Solute offered any evidence demonstrating that the underlying contract's scope of work was expanded by the task order.  Rather, its challenges reflect only its disagreement with the manner in which SPAWAR evaluated the task order proposals; in other words, that SPAWAR improperly downgraded its proposal on almost every evaluation factor while unfairly inflating Sentek's proposal.  Because the exception to the task order protest bar does not encompass challenges to proposal evaluations, the court lacks the authority to entertain Solute's protest.

### III.  CONCLUSION

Because the court lacks jurisdiction to entertain Solute's bid protest, defendant's motion to dismiss is **GRANTED**.  Solute's protest is **DISMISSED** without prejudice.  All other outstanding motions are **DENIED** as **MOOT**.  No costs.  The clerk shall enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine proposed redactions agreeable to all parties.  Then, by **no later than Friday, March 9, 2012**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

-16-